[Cite as *In re J.H.*, 2013-Ohio-1293.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| J.H., DEPENDENT CHILD. | : | |
| | : | **CASE NO. 2012-L-126** |
| | : | |

Appeal from the Lake County Court of Common Pleas, Juvenile Division, Case No. 2010 DP 1323.

Judgment: Affirmed.

*Matthew W. Weeks,* Carl P. Kasunic Co., L.P.A., 4230 State Route 306, Building I, Suite 300, Willoughby, OH 44094 (For Appellant-Amber Hughley).

*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Appellee-Lake County Department of Job and Family Services).

*Darya Jeffreys Klammer,* The Klammer Law Office, Ltd., Lindsay II Professional Center, 6990 Lindsay Drive, #7, Mentor, OH 44060 (Guardian ad litem).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Amber Hughley, appeals the judgment of the Lake County Court of Common Pleas, Juvenile Division, terminating her and her husband Lanny Hughley's parental rights concerning their son J.H.; denying the motion of Amber's mother Eva Freeman, J.H.'s maternal grandmother, for custody; and granting appellee, Lake County Department of Job and Family Services ("JFS"), permanent custody. For the reasons that follow, the judgment is affirmed.

{¶2} On July 29, 2010, JFS filed a complaint, alleging that J.H., then two months old, was a dependent child, pursuant to R.C. 2151.04, and moved for emergency temporary custody. Following a hearing on the motion that same day, the court granted emergency temporary custody of J.H. to JFS. J.H. was placed with a foster family that night, where he has resided to date. J.H. is now two years old.

{¶3} The adjudication hearing was held on October 8, 2010, and, by agreement of the parties, J.H. was found to be a dependent child. The disposition hearing was held on October 22, 2010. The court adopted a case plan and granted temporary custody to JFS. The case plan goals included early intervention for J.H. due to chaos and conflicts in the home; physical health issues for Amber; and mental health assessments, parenting, safe and stable housing, and marital counseling for Amber and Lanny. Eva was added to the case plan in October 2010. Eva's goals included a mental health assessment and allowing JFS to make monthly home visits. The parties were required to give releases of information for all their goals.

{¶4} On January 24, 2012, JFS filed a motion for permanent custody of J.H. On April 23, 2012, JFS withdrew that motion to give Lanny additional time to meet his goals. On June 28, 2012, JFS filed the instant motion for permanent custody. On August 22, 2012, Eva filed a motion for custody.

{¶5} J.H.'s guardian ad litem, Darya Klammer, filed a report prior to the custody hearing recommending the court grant permanent custody of J.H. to JFS.

{¶6} The court proceeded to hearing on September 27-28, 2012, on JFS' second motion for permanent custody and Eva's motion. Stephen Kanter, Ph.D., Psychology, completed a psychological evaluation of Amber, age 26, and Lanny, age 44. Dr. Kanter said Amber has "severe" mental problems for which she was already on

2

psychotropic drugs. She had a number of psychiatric hospitalizations, made several suicide attempts, and has received psychiatric care for years. She is emotionally unstable. She makes very poor, irresponsible decisions. Amber is unable to meet J.H.'s basic needs due to her low cognitive functioning level and her emotional instability.

{¶7} Further, Dr. Kanter said Lanny's judgment and reasoning are poor. Although he graduated from a local college, his intelligence is at the lower end of the average range. He is easily influenced and manipulated by others, including Amber. He does not understand the depth of her mental problems. Dr. Kanter said that if Lanny and Amber were living together with J.H., Amber would unduly influence Lanny regarding J.H. Dr. Kanter said Lanny and Amber get into frequent arguments that include physical violence. He said that if they are together, they would not be able to care for J.H. competently. Separately, he said it is not in J.H.'s best interests to be taken care of by Amber, and, although Lanny alone could provide a caring home, it is unlikely he would ever be able to appropriately discipline J.H.

{¶8} Colleen Connors, JFS intake social worker, said she received a dependency referral on May 18, 2010, due to problems with Amber's physical and mental health. Amber and Lanny were then living with J.H. in the basement of a house rented by Eva, Amber's mother, in Eastlake. Eva lived upstairs with her two teenage sons. Amber has problems with her heart and has a pacemaker. She was very weak and was threatening to commit suicide. There were concerns that, due to her poor health, she could not take care of J.H.

{¶9} Ms. Connors said that Amber called her on July 8, 2010, and left a frantic-sounding message, saying, "Come get [J.H.] * * * He's in danger. You need to take him away immediately." Amber called again and told Ms. Connors that Lanny and her half-

3

brothers were fighting. Amber said she was going to kill her mother Eva by slicing her throat and her head open. Ms. Connors contacted Lanny, who was then staying at his mother's house, and asked if he would take J.H. for his protection. Lanny refused. During July 2010, Amber repeatedly called Ms. Connors, saying J.H. was not safe and that JFS needed to take custody of him because she could not care for him.

**{¶10}** Michelle Edwards, JFS ongoing social worker, testified she met with Amber and Lanny at her office on July 20, 2010. Amber and Lanny said they and J.H. were not safe in Eva's house. They said Lanny often fights with Eva's sons. Amber and Lanny said they were worried that Eva and her sons would harm J.H. and then blame them to make them look like bad parents. Amber said that one of Eva's teenage sons would call J.H. a "f _ _ _ er" and throw him to the floor. Amber and Lanny both admitted committing acts of domestic violence against each other.

**{¶11}** Ms. Edwards said Lanny told her that on one occasion, he was tired and fell asleep in a reclining chair while holding J.H. The child fell three to four feet to the floor. Lanny said he was holding J.H. at the time because Amber "made him."

**{¶12}** Ms. Edwards testified that on July 27, 2010, Amber called her, saying she was unable to care for J.H. She said a social worker needs to come and take him. As a result, Ms. Edwards went to Amber's house. Upon her arrival, Eva was holding the child. J.H. looked like he was being overfed. The amount of formula Amber and Eva said they were feeding J.H. was twice the amount he should be eating.

**{¶13}** On July 28, 2010, Amber called Ms. Edwards and told her she could not continue to care for J.H. After this conversation, Ms. Edwards decided that emergency temporary custody was necessary. She called Amber later that day to inform her that an emergency temporary custody hearing was scheduled for July 29, 2010. Ms.

4

Edwards said that later that evening, Amber left 13 voice messages for her. In these messages, Amber called Ms. Edwards a "stupid social worker" and said she was destroying her family. Lanny also called Ms. Edwards that evening. He pled with her not to let Eva have custody of J.H.

{¶14} The hearing on JFS' emergency temporary custody motion was held on July 29, 2010. While Amber attended the hearing, Lanny and Eva did not. Following the hearing, the court granted JFS emergency temporary custody.

{¶15} Ms. Edwards testified that, later that day, she, along with three Eastlake police officers, went to Amber's residence to pick up J.H. They knocked loudly on the front door. The officers announced their presence. They saw a child running in the house. Eva's car was in the driveway. However, no one answered the door. Finally, after 45 minutes of pounding on the door, the officers kicked it in to gain entrance.

{¶16} Inside the house, Eva was holding J.H. Her two sons and Amber were also present. The officers instructed Eva to hand J.H. over to Ms. Edwards. Eva was irate and said Ms. Edwards had no right to be there. Eva lunged at her. The police instructed Eva to sit down. Ms. Edwards then drove J.H. to his foster parents' home.

{¶17} In August 2010, Eva called Ms. Edwards and said she wanted to be considered for placement. JFS initiated a home study process for her. However, Eva did not follow through with it and did not complete the required paperwork. She eventually withdrew her request for placement. Also in August 2010, Amber called Ms. Edwards several times, saying she and Lanny were staying in motels. Amber said she and Lanny were struggling financially and could not afford a place to stay.

{¶18} Melissa Flick, JFS case supervisor, testified that in August 2010, JFS set up supervised visits with J.H. for Amber and Lanny together twice a week at JFS. Ms.

5

Flick testified that during a visitation with J.H. in October 2010, Amber and Lanny got into a verbal altercation and were yelling at each other while Amber was holding J.H. In J.H.'s presence, Amber yelled at Lanny, "I'll f _ _ _ you up." Lanny screamed back, "I'll f _ _ _ you up, bitch." Ms. Flick and another social worker had to break it up.

{¶19} In November 2010, Lanny asked that his mother be considered for placement. JFS initiated a home study process for her, but she never submitted the necessary paperwork. Subsequently, she decided not to complete the process.

{¶20} In December 2010, Ms. Flick had a telephone conversation with Amber. Ms. Flick asked her how she was doing with her case plan goals. Amber said she was not going to work on her goals anymore. She said she would just have another baby and replace J.H. Amber said that is what she did when she lost custody of her first son in Cuyahoga County. She said she had J.H. to replace him. She said she is going to replace J.H. by having more children until JFS allows her to keep one of them.

{¶21} Ms. Flick testified that by June 2011, there had been some case plan compliance. They were near the one year mark when the agency has to decide to either return the child or pursue permanent custody. JFS was working on a reunification plan for Amber and Lanny, and, to do that, it increased visitation to allow them unsupervised visitation. However, soon after their visitation increased, Amber started acting erratically. Ms. Flick received information that Amber was inviting strange men into their apartment in Mentor while Lanny was at work and J.H. was in her care. As a result, Ms. Flick became concerned for J.H.'s safety.

{¶22} On July 18, 2011, Ms. Flick and Ms. Fuerst went to Amber and Lanny's apartment to pick up J.H. and to explain they were going to request that visitation once again be supervised due to Amber's "risky behaviors." Amber and Lanny admitted that

6

Amber was inviting men into their apartment after Lanny went to work and that Amber had sex with a man who lives in the complex while J.H. was with her for an unsupervised visit. Lanny said he should not be punished when he did not do anything wrong. He did not understand it was unsafe for him to leave J.H. alone with Amber during their unsupervised visits when she was obviously engaging in risky behaviors.

{¶23} JFS petitioned the court for visitation to become supervised as to both Amber and Lanny. While the court reduced Amber's visitation to supervised, it continued Lanny's unsupervised visitation at his mother's house in Cleveland. In November 2011, Ms. Flick conducted a home visit at this residence. Ms. Flick was concerned with J.H. being at Lanny's mother's house due to various problems with the house. First, the ceiling was caving in in the bathroom to the point where one could see the rafters in the attic from the bathroom. Second, the stairs leading to the basement and also to the second floor, where Lanny stays, are dangerously steep. Third, the house was infested with cockroaches. Fourth, none of the smoke alarms were working.

{¶24} Ms. Flick told Lanny that before he could resume visitation in his mother's house with J.H., he would have to have a fire inspection of the house; put locks on the doors leading to the basement and upstairs; and fix the bathroom ceiling.

{¶25} Lanny said his mother and sister could not be counted on to provide child care while he is at work. As a result, Ms. Flick told Lanny he would have to come up with a child care plan with a child care agency for when he is at work.

{¶26} Ms. Flick testified that, four months later, in March 2012, Lanny called her to cancel a visit with J.H. because his van was not working. Ms. Flick told him that because his van is unreliable, he should not just cancel visits with J.H. when it is not

7

running. She said he should have a backup plan for transportation. Ms. Flick also asked Lanny if he had arranged for a fire inspection yet, but he still had not done so.

{¶27} Two months later, in May 2012, Ms. Flick conducted another home visit at Lanny's mother's house. He recently had the fire inspection done, but, while he put a lock on the basement door, he still had not yet installed a lock to the door leading upstairs. Despite this deficiency, Ms. Flick allowed Lanny to resume unsupervised visits with J.H. at his mother's house. Ms. Flick asked Lanny if he had made arrangements yet for child care while he is at work. Although six months had passed since she told him about this requirement, he still had not yet contacted a child care agency. After repeated prodding, Lanny finally contacted an agency in September 2012, ten months after he was instructed to do so.

{¶28} Ms. Flick told Lanny she was concerned because it takes him too long to do things that are necessary for J.H.'s safety. She also said he is unable to identify risk factors for J.H. Lanny said he did not agree with anything Ms. Flick was telling him.

{¶29} Ms. Flick said Lanny cannot problem-solve or make parenting decisions. For example, she asked him, if J.H. was with him full-time, what discipline would he use for J.H. when necessary. Lanny had no idea what he would do. She asked Lanny if J.H. came to live with him, how would he provide for a smooth transition for J.H. from his foster home to Lanny's mother's house. He did not know what he would do.

{¶30} Ms. Flick testified that as of June 2012, Amber had supervised visitation at JFS. Lanny agreed to participate in these weekly meetings. During a scheduled visit in June 2012, J.H. and Amber appeared, but Lanny did not. As a result, Amber said she was leaving. Ms. Flick tried to persuade Amber to stay since J.H. had been brought to

JFS for the visit. In J.H.'s presence, Amber left, saying she was not going to visit unless Lanny was there because she was only there to see him.

**{¶31}** Ms. Flick testified that Amber and Lanny separated in October 2011. However, after they separated, Amber repeatedly told her they had a "plan" that once J.H. was reunited with Lanny and the agency was out of their lives, they would reunify and parent J.H. together.

**{¶32}** Ms. Flick's concerns with Amber are her: (1) not taking her medications, (2) inability to maintain stable housing, (3) difficulty in caring for J.H. due to her physical and mental problems, (4) domestic violence, and (5) risky behaviors.

**{¶33}** Ms. Flick's concerns with Lanny are his: (1) history of domestic violence, (2) cognitive limitations, (3) inability to recognize when Amber becomes erratic, (4) failure to protect J.H. from Amber, (5) inability to identify risk factors for J.H., and (6) inability to problem-solve in typical parenting situations.

**{¶34}** Ms. Flick testified she had multiple conversations with Amber and Lanny about their case plan goals and the status of their compliance. The case plan goals were designed to alleviate JFS' concerns. However, the parents' participation in the goals did not alleviate the agency's concerns.

**{¶35}** Ms. Flick testified that, although Lanny loves J.H. and would not knowingly harm him, she does not believe it is in J.H.'s best interests that he be raised by Lanny.

**{¶36}** Julie Gembus from Help Me Grow testified she worked with Amber and Lanny teaching them parenting skills and attended their supervised visits with J.H. Out of 43 sessions, Amber missed four and Lanny missed one.

**{¶37}** Ms. Gembus said that Amber was often not taking her medication. At those times it was hard for Amber to interact with her or J.H. because she was lethargic.

9

**{¶38}** Ms Gembus said that Amber and Lanny had inappropriate conversations in front of J.H. On one occasion, Amber and Lanny had been fighting before a visit. They came in angry with each other. There was tension in the room, which made J.H. very upset. On another occasion, during a visit with J.H., Lanny said that he had hired a man to watch Amber. She said that she and this man ended up having a sexual relationship while Lanny was at work. Lanny and Amber also told Ms. Gembus that Amber had sex with a man living in their apartment complex while J.H. was alone with her for an unsupervised visit. Ms. Gembus said Lanny did not seem concerned about Amber's sexual activities with these men.

**{¶39}** Ms. Gembus said that, although Lanny appeared to understand the parenting skills she taught him, she does not believe he has sufficient parenting skills or knowledge to raise J.H. She said that even if Amber was no longer living with Lanny, he would not have the ability to protect J.H. and make appropriate decisions for his safety. She said that, although Lanny loves J.H. and has some nurturing skills, Lanny told her about a "plan" he had with Amber where Amber would sign over her rights to J.H. to Lanny and she would stop complying with the case plan, although she would live with them. Ms. Gembus is thus concerned that if Lanny was granted custody, he would allow Amber to live with them and permit inappropriate people to be around J.H. She is afraid Lanny would put J.H. at risk due to his poor judgment. As a result, she said it would not be in J.H.'s best interests if Lanny was granted custody.

**{¶40}** Carrie Koenig, also from Help Me Grow, testified she also worked with the family at JFS during supervised visits. During their visits Amber would talk about her sexual behaviors in front of Lanny and J.H. Because Amber did not focus on the

purpose of the program, she was terminated in March 2012 and Help Me Grow continued with Lanny alone.

{¶41} Ms. Koenig said that, although she did not see any inappropriate reactions by Lanny, he was unable to verbalize any plans for parenting. The only time Lanny was able to discuss parenting was during one visit that took place the day before the custody hearing. She said Lanny does not understand that a child needs a routine. She said it would not be in J.H.'s best interests if Lanny was granted custody because Lanny does not have the parenting skills necessary to parent J.H.

{¶42} Amber and Lanny have been involved in several incidents of domestic violence and fights resulting in police involvement. First, Lanny was convicted of domestic violence against Amber in 2009.

{¶43} In the following year, on May 30, 2010, while Amber and Lanny were living together in Eastlake with Eva and J.H. was one month old, Amber and Lanny got into a fight. Lanny pushed Amber and elbowed her in the mouth. The responding officer saw a bruise inside her lip. Lanny also bruised her arm by grabbing her. Lanny was again convicted of domestic violence.

{¶44} Five months later, on October 4, 2010, Lanny reported to Euclid Police that Amber had been kidnapped. Lanny reported that he and Amber had been fighting. He left and returned at midnight, but she was not there. She texted him at 3:00 a.m., saying she had been kidnapped by two men in a van. Shortly thereafter, Cleveland Police picked up Amber and two men in Cleveland. Amber told police that after she and Lanny fought, she went into an internet chat room, met two men, and invited them to the apartment. They picked her up in a van. They went driving around Cleveland. The driver of the van was intoxicated and driving recklessly. She and the two men were

11

drinking. Amber said she went in the back of the van with one of the men. He pulled down their pants and they "made out." After a while, she said she wanted to go home. They did not immediately take her so she texted Lanny saying she was kidnapped. Amber refused to press charges.

{¶45} One year later, on October 18, 2011, Eastlake Police responded to a call of a male and female hitting each other in a van parked at Walgreen's. Amber told police she and Lanny got into an argument while Lanny was driving them home from a session with their marriage counselor. Amber said Lanny started hitting her. The officer saw a cut on her lip. Amber admitted she hit Lanny back. Felony domestic violence charges were filed against Lanny and Amber, but the charges were later nolled.

{¶46} Sharon McPadden testified that she is employed as a registrar at a local high school. Her husband is a teacher. She and her husband have one son, age 6, and a foster child, J.H., who is two years old. She said that J.H. has been in their care since July 29, 2010, when he was two months old.

{¶47} Ms. McPadden said that, initially, after J.H.'s visits with Amber, Lanny, and Eva, J.H. would come home and have terrible tantrums banging his head against a wall. By being patient and calming him, the tantrums have subsided. She said that after visits with Lanny at his mother's house, J.H. has come home with flea bites all over his back. In September 2012, he came home with more than 25 flea bites. She said that J.H. shares a bedroom with her son and they are very close. J.H. is on target with all his developmental milestones. He is very well adjusted. He keeps a regular routine. J.H. is comfortable with his environment and loves his foster parents and their son. If JFS is granted permanent custody, she and her husband will pursue adoption.

12

**{¶48}** Bridget Fuerst, JFS ongoing social worker, testified that Amber's first child was permanently removed from her care in January 2010 by Cuyahoga County Children Services due to her chronic mental illness and chemical dependency. Amber reported she was unable to reunify with her first son because she was residing with Eva, and Cuyahoga County Children Services found Eva's home to be inappropriate.

**{¶49}** Ms. Fuerst testified that in order to monitor progress with the case plan goals, she scheduled monthly visits with the family to discuss progress with their goals.

**{¶50}** With respect to Amber and Lanny's parenting goal, Lanny complied with it by participating in Help Me Grow, but Amber was terminated from the program.

**{¶51}** With respect to their safe-and-stable-housing goal, after J.H. was removed from their home in July 2010, Amber and Lanny moved out of Eva's house and stayed in motels. When they could not afford motels, they lived in Lanny's van.

**{¶52}** In September 2010, Amber and Lanny rented an apartment in Euclid. In January 2011, Amber was in a fight with another resident resulting in their eviction.

**{¶53}** Then, in March 2011, Amber and Lanny moved to an apartment in Mentor where they stayed until October 2011. While living there, several disturbing incidents occurred. In April 2011, Ms. Fuerst made a home visit. Before entering the apartment, she heard Amber and Lanny arguing inside. She knocked and Amber and Lanny opened the door. They had obviously been engaging in domestic violence. Lanny admitted he assaulted Amber. He said he pushed her so hard she fell in the bathtub.

**{¶54}** In July 2011, Amber told Ms. Fuerst she was having sex in their apartment with the father of her first child and also with a man who lives in the complex.

**{¶55}** In October 2011, Amber and Lanny were evicted from their Mentor apartment for nonpayment of rent and because Amber had solicited sex from three

different residents. On October 18, 2011, Lanny and Amber were both arrested for the domestic violence incident at Walgreen's referenced above. After they were released from jail, Amber moved in with her maternal grandparents in Eastlake and Lanny moved in with his mother in Cleveland. They have not lived together since. While living with his mother, Lanny repaired her house and his housing is now structurally safe.

**{¶56}** Amber and Lanny's next goal was a mental health assessment and to follow any recommendations. They each completed an assessment. Marital counseling was recommended for both. Although Amber is now compliant with her goal that she take her psychotropic medication, she has continued her risky behaviors.

**{¶57}** Amber and Lanny's final goal was marital counseling. They stopped attending their sessions after they engaged in domestic violence in October 2011. Lanny has complied with this goal by participating in individual counseling; Amber refused such counseling. Ms. Fuerst's concerns regarding this goal have not been alleviated due to Lanny and Amber's repeated incidents of domestic violence.

**{¶58}** Ms. Fuerst testified that in September 2012, Amber told her that, although she and Lanny are not now living together, they regularly text each other and they have been together several times in 2012. Amber said Lanny told her not to tell anyone that they are still in contact. Amber said they plan to reunite after Lanny gets custody of J.H. and JFS is no longer involved. Later that day, Ms. Fuerst asked Lanny if he was still in contact with Amber. He said he was not. When Ms. Fuerst told Lanny she had seen text messages he had recently sent to Amber, he admitted he is still in contact with her. In a text, dated September 18, 2012, one week before the custody hearing, Lanny told Amber he was angry with her for telling Ms. Fuerst they are still in contact. He said this

14

proves Amber does not love him. As a result, he said he was not going to rent a house for them.

{¶59} Ms. Fuerst testified regarding the parties' visitation with J.H. Initially, Amber and Lanny had two supervised visits together with J.H. each week. Then, beginning in June 2011, they had unsupervised visits for one month until July 11, 2011, when Amber admitted having sex with another man while J.H. was present. Thereafter, Amber had supervised visits at the agency once a week and Lanny had one unsupervised visit at his mother's house each week. In May 2012, Lanny began unsupervised visits each Saturday and one overnight each Tuesday at his mother's house. At that time Amber was given two supervised visits each week at JFS. Throughout this case, Eva's visitation has remained the same: one supervised visit at JFS with J.H. every other week. Although Eva requested increased visitation in April 2011, JFS declined due to her refusal to allow home visits.

{¶60} During Lanny's third unsupervised visit in October 2011, he took J.H. to Amber's grandparents' house where Amber was living and allowed Amber and Eva to have an unsupervised visit with him. According to the court's visitation order, neither Amber nor Eva was allowed unsupervised visits. When questioned by Ms. Fuerst about this incident, at first Lanny said he did not know Amber was there. Later, he admitted he knew she was there. He admitted he allowed Amber and Eva to have an unsupervised visit with J.H. knowing it violated the court's order.

{¶61} In 2012, Amber and Lanny were inconsistent with visitation. In January 2012, Amber failed to attend five visits with J.H. She said she missed them because she was trying to get pregnant. She said she slept with four different men in the same

week and was tired. In February 2012, Amber missed four visits because she was still trying to get pregnant. She missed four visits in March, seven in April, and six in May.

{¶62} In June 2012, Ms. Fuerst sent a letter to Amber telling her that, due to her lack of commitment to her visits with J.H., her visits were being reduced to one supervised visit per week, and she would have to call one hour ahead to confirm. Thereafter, Amber stopped visitation with J.H. In that month Amber became pregnant.

{¶63} Lanny missed one scheduled visit in March 2012 and one in April. In June he missed five visits and cut three of his Saturday visits short. In July, August, and September, he cut his Saturday visits with J.H. short 10 times. Lanny was supposed to keep J.H. from 8:00 a.m. until 6:00 p.m. on Saturdays, but on each occasion when he cut his visits short, he ended the visits at about 1:30 p.m.

{¶64} Ms. Fuerst testified that Amber has not progressed sufficiently with her goals to be able to parent J.H. She cannot care for herself, let alone J.H. She remains unstable and erratic. Her grandparents will not allow her to continue staying with them so she will have no place to live.

{¶65} Ms. Fuerst said that Lanny has also not progressed with his goals sufficiently to be able to parent J.H. It takes him too long to complete his goals and to initiate services. It took him five months to get a fire inspection of his mother's house. Also, it took him ten months to contact a day care agency. Lanny also needs constant coaching in taking care of J.H. For example, after Lanny's first full-day visit with J.H., Ms. Fuerst asked him what J.H. had eaten that day. Lanny said two cereal bars and a fruit cup. He admitted he did not give J.H. anything for lunch. Thereafter, Ms. Fuerst has had to continually remind Lanny to give J.H. breakfast and lunch. Moreover, Ms. Fuerst referenced the many visits with J.H. Lanny either cancelled or cut short.

16

{¶66} Ms. Fuerst said that neither Amber nor Lanny is able to provide for J.H.'s basic needs. She said they cannot provide a stable environment free from domestic violence. Although there has been "some progress" on their case plan, they have not progressed with their goals sufficiently to parent J.H. Ms Fuerst said that Lanny has not ended his relationship with Amber, and, based on Lanny's admission that he is still in contact with her, Ms. Fuerst believes he will never end their relationship.

{¶67} With respect to Eva, Amber told Ms. Fuerst and her counselors that when she was a child, she was abused by her mother and her mother's boyfriend. However, during the custody hearing, she told Ms. Fuerst in the ladies' room that Eva did not abuse her as a child. Regardless of the truth of these allegations, Ms. Fuerst testified that Eva has not progressed with her case plan goals sufficiently to parent J.H. Although Eva completed a mental health assessment in October 2010, when Ms. Fuerst reviewed it, she saw that Eva did not disclose the prior termination of her own parental rights in Cuyahoga County. As a result, the court ordered her to complete a second assessment. However, it took her seven months to complete it and she refused to sign a release of information for that assessment, forcing JFS to file a show-cause motion against her in June 2011. Eva only signed a release after she was ordered to do so.

{¶68} Further, Eva failed to comply with her monthly home visit goal for two years from October 2010 to August 2012. Ms. Fuerst made 21 attempts to meet with Eva at her residence; however, only three visits were completed. Also, in April 2012, while Ms. Fuerst was having a home visit with Amber at her maternal grandparents' home, Eva walked in and was enraged. She had recently received the guardian ad litem's report, and screamed at Ms. Fuerst, "I'm so sick of you f _ _ _ ing people." She

said that when this was all over, Ms. Fuerst would be going to prison. Eva remained irate and threatening, forcing Ms. Fuerst to end her visit with Amber.

**{¶69}** Both Amber and Lanny told Ms. Fuerst that J.H. would not be safe with Eva if she was granted custody.

**{¶70}** Ms. Fuerst said there are no other relatives willing to care for J.H. She said that granting permanent custody to JFS is in J.H.'s best interests. He is bonded to his foster parents and brother. He is comfortable and happy with them.

**{¶71}** Lanny testified he does metal work in a factory and works the afternoon shift. He met Amber in a gas station on East 55th Street in Cleveland. At that time she was pregnant with her first son. They married in 2008, and he moved in with her and her child in the basement of Eva's house. While they were married and living together, Cuyahoga County Children Services was granted permanent custody of the child.

**{¶72}** Lanny said he was not in J.H.'s life much when he was a baby due to his multiple domestic violence cases, which resulted in no-contact orders.

**{¶73}** Lanny admitted he is not sufficiently trained to raise J.H., although JFS has been providing parenting training to him through Help Me Grow for two years.

**{¶74}** Lanny said he filed for divorce in April 2012 and plans to stay away from Amber if he gets custody. However, Lanny told Amber the reason he filed for divorce was to get custody in this case. Lanny admitted he lied to Ms. Fuerst when he told her he had not been in contact with Amber in 2012. He admitted they are still in contact, although he knows their relationship is harmful to J.H. due to the constant violence between them.

**{¶75}** Amber did not testify or present any witnesses on her behalf.

18

{¶76} Eva, age 44, testified she lost custody of three of her children to Cuyahoga County Children Services in 1999, due to Amber's false allegations that Eva was abusing the children. Amber had previously been removed from Eva's custody when she was a teenager. Each of Eva's four children has a different father. Eva's 16-year old daughter lives with Eva's sister. Eva's two teenage sons now live with her.

{¶77} Eva admitted she did not complete the home study paperwork for her to obtain custody of J.H. She also admitted she refused Ms. Fuerst's repeated requests for home visits for two years. She said she refused because she was then living with her sister, who would not allow the visits. However, Ms. Fuerst said Eva did not give her this excuse until June 2011, after refusing to allow JFS home visits for eight months. Eva admitted her visitation never increased beyond supervised visits because she would not allow the social workers to make home visits as ordered by the court.

{¶78} Presently, Eva lives in a basement apartment in Willoughby that has two bedrooms. She has one bedroom and her two sons share the second bedroom. She said that if she was awarded custody of J.H., he could have her bedroom and she would sleep on the couch in the living room.

{¶79} Eva admitted that she and Amber have regular contact with each other. Eva said that Amber lives with Eva's parents and that Eva visits them daily. Eva said she should get custody because she is J.H.'s biological relative. Eva said Lanny should not get custody because he is "mentally unstable" and J.H. would not be safe with him.

{¶80} Darya Klammer, J.H.'s guardian ad litem, testified that Amber is not capable of providing a safe and stable environment for J.H. She said that J.H. is bonded with Lanny, but he is unable to grasp parenting concepts or to do what is necessary for J.H. without constant prodding. She said that Lanny's poor judgment and

19

decision-making are likely to put J.H. in harm's way. As a result, Ms. Klammer recommended that Lanny not be awarded custody.

{¶81} Ms. Klammer said that, although J.H. is bonded with Eva, she maintains a relationship with Amber. She said that Eva and Amber are in constant contact. She said Amber is "toxic" to J.H.'s future and any contact with Amber will be harmful to him. As a result, Ms. Klammer recommended that Eva not be awarded custody.

{¶82} Ms. Klammer said that J.H. is two years old and is not old enough to have any understanding of these proceedings. As a result, she said there is no point in asking him his wishes. She said that J.H. is now thriving. He is well adjusted and doing very well in his foster parents' care. J.H. is bonded with them and their son. Ms. Klammer recommended that permanent custody be granted to JFS.

{¶83} Following the presentation of the evidence, the trial court entered judgment terminating Amber's and Lanny's parental rights, denying Eva's motion for custody, and granting permanent custody to JFS.

{¶84} While Amber appeals the judgment, Lanny and Eva do not. Amber's first two assignments of error are related and shall be considered together. They allege:

{¶85} "[1.] The trial court erred, and abused its discretion, when it granted permanent custody to the Department pursuant to R.C. 2151.414(B)(1)(d), without discussing all five best interest factors set forth in R.C. 2151.414(D)(1)(a) through (e), as required by this Court.

{¶86} "[2.] The trial court erred, and abused its discretion, when it granted permanent custody to the Department pursuant to R.C. 2151.414(B)(1)(d), without providing due consideration and careful discussion of the best interest factors set forth in R.C. 2151.414(D)(1)(a), (d), and (e), as required by this Court."

{¶87} It is well settled that a parent's right to raise a child is a basic civil right. *In re Phillip*s, 11th Dist. No. 2005-A-0020, 2005-Ohio-3774, ¶22, citing *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). Thus, a parent defending a motion for termination of parental rights "'must be afforded every procedural and substantive protection the law allows.'" *Id.*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). However, "[w]hile a parent has certain rights concerning his or her child, the focus of a permanent custody hearing and decision is not the parent's rights but rather the child's best interests." *In re West*, 4th Dist. No. 05CA4, 2005-Ohio-2977, ¶49. "Parental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate parental rights." *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶88} R.C. 2151.414 sets forth the guidelines to be followed by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B)(1) outlines a two-prong analysis. *In re B.D.*, 11th Dist. Nos. 2009-L-003 and 2009-L-007, 2009-Ohio-2299, ¶101. Under the first prong, the juvenile court must determine whether one of the four circumstances outlined in R.C. 2151.414(B)(1)(a) through (d) applies. *B.D*, *supra.* Amber concedes that subsection (d) applies here because J.H. has been in the temporary custody of JFS for at least 12 months of a consecutive 22-month period. As of the custody hearing, J.H. had been in JFS' custody for 26 months.

{¶89} If the juvenile court determines that one of the foregoing circumstances applies, the court must then proceed to a determination of the second prong in which it considers whether the award of permanent custody to the agency is in the best interests of the child based on an analysis of R.C. 2151.414(D). *B.D.*, *supra*. In making this determination, R.C. 2151.414(D) requires the juvenile court to consider each of the following factors: (1) the interaction and interrelationship of the child with the child's

21

parents, siblings, relatives, foster parents, and other persons who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the county; and (5) whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶90} The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to a children services agency only if it finds, by clear and convincing evidence, that both prongs of the above test are met. *In re Krems*, 11th Dist. No. 2003-G-2535, 2004-Ohio-2449, ¶36. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Id.*

{¶91} In cases involving the termination of parental rights, an appellate court applies the civil manifest weight of the evidence standard of review. *In re D.H.*, 11th Dist. No. 2007-G-2759, 2007-Ohio-3337, ¶20-21. According to this standard, if the trial court's grant of permanent custody to the county is supported by some competent, credible evidence, we must affirm the court's decision. *Id.*

{¶92} Amber argues the court erred in granting custody to JFS without sufficiently discussing three of the best-interest factors.

{¶93} First, Amber argues the court's discussion of the first best-interest factor, i.e., the interaction and interrelationship of the child with his parents, relatives, foster parents, and others who may significantly affect him is insufficient because the judgment does not discuss J.H.'s relationships with Amber, Lanny, or Eva. We do not agree. In *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, the Supreme Court of

22

Ohio held that the trial court satisfied its duty under this factor when it discussed the child's relationship with his foster family, visitation with his parents, and his interaction with his grandparents. *Id.* at ¶57, 58, and 63.

{¶94} As to Amber, the court found that in the last several months, her relationship with J.H. has been non-existent as she voluntarily ceased her visitation with him. As to Lanny, although the court found that he wants a father-son relationship with J.H., the court questioned his commitment to J.H. because he has not ended his relationship with Amber, although he admitted it is harmful to the child. The court also noted that Lanny has had unsupervised visitation since June 2011, which increased to twice a week in May 2012. As to Eva, the court found that, although Amber is toxic to J.H., Eva has continued to have a relationship with her. Further, the court found that Eva failed to cooperate with JFS and has only had limited, supervised visitation that never progressed. Finally, the court found that J.H. has been in foster care with the same foster family for more than two years since he was two months old. His foster parents have developed a loving, caring, and structured environment for him. J.H. has a brotherly relationship with their son. J.H. has met all his developmental milestones in foster care. The trial court thus satisfied its duty to discuss J.H.'s interaction and relationships with those who may significantly affect him. *Schaefer*, *supra*.

{¶95} Next, Amber argues the trial court's discussion of the fourth best-interest factor was insufficient. Again, we disagree. The court found that J.H. needs a legally secure permanent placement and that such placement cannot be achieved without a grant of permanent custody to JFS. The court found that, although J.H. had been in the custody of JFS for 26 months, placement with Amber or Lanny would not be possible in the reasonably foreseeable future. In support, the court found that Amber is not

23

physically or emotionally stable enough to care for J.H. and cannot provide a safe and stable environment for him. The court found that, after two years of parenting training, Lanny still cannot grasp parenting concepts. The court found that Lanny is unable to follow through with good parenting skills and cannot provide the structure and developmental guidance J.H. requires. Further, the court found that Eva has not complied with JFS' requests. She did not allow court-ordered home visits by JFS for two years and was not truthful in her mental health assessment. Moreover, the court found that JFS has investigated relative placement other than Eva, i.e., Lanny's mother, to no avail. Finally, the court found that J.H.'s foster parents are willing to adopt him should custody be awarded to JFS. Thus, the court discussed J.H.'s need for legally secure placement. *See In re Goff*, 11th Dist. No. 2004-A-0051, 2004-Ohio-7235, ¶49.

{¶96} Third, Amber argues the trial court erred in not discussing the fifth best-interest factor, i.e., "whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child." Again, we disagree. These factors include whether a parent has had the parental rights terminated with respect to a sibling of the child. R.C. 2151.414 (E)(11). While the court did not discuss this factor under its best-interest analysis, the court satisfied its duty by discussing this factor elsewhere in the judgment. *See In re Jacobs*, 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, *13 (Aug. 25, 2000). The court found "that a prior order ha[d] been issued [by the Cuyahoga County Court of Common Pleas] granting permanent custody of" Amber's first child to Cuyahoga County Children Services. Thus, the court found that one of the factors at R.C. 2151.414(E)(7) to (11) applied. We note there is no evidence in the record that any of the other factors in R.C. 2151.414(E)(7) to (E)(11) applies here. The court thus satisfied its duty to discuss the fifth best-interest factor.

24

{¶97} Amber's first and second assignments of error are overruled.

{¶98} Amber's third and fourth assigned errors are interrelated and shall be considered together. They allege:

{¶99} "[3.] The trial court's findings regarding the interaction and interrelationship between [J.H.] and his parents and Grandma [sic] pursuant to R.C. 2151.414(D)(1)(a) are against the manifest weight of the evidence as the trial court's analysis does not address all of the essential elements of the case, by failing to acknowledge the close bond [J.H.] has to his Father and Grandma.

{¶100} "[4.] The trial court's findings regarding [J.H.]'s need for a legally secured [sic] placement pursuant to R.C. 2151.414(D)(1)(d) are against the manifest weight of the evidence as the trial court failed to acknowledge Father's substantial case plan compliance, which warrants granting additional time for reunification to occur."

{¶101} Amber argues the court's finding regarding J.H.'s relationship with Lanny and Eva is against the manifest weight of the evidence because the court did not mention J.H.'s bond with Lanny or Eva in its judgment. However, as noted above, the judgment discussed J.H.'s relationships with Lanny and Eva, and it was undisputed below that J.H. has a bond with Lanny and Eva. However, despite this bond, (1) the parties admitted J.H. was a dependent child before JFS' involvement; (2) Lanny has not ended his relationship with Amber; and (3) Eva did not complete the home study process, withdrew her request for placement, and is in constant contact with Amber.

{¶102} Next, Amber argues that the trial court's finding that Lanny cannot provide a legally secure placement is against the manifest weight of the evidence based on his "substantial" case plan compliance, which, she argues, warrants additional time for reunification.

25

{¶103} While the parents' progress is measured in part by their completion of the case plan goals, the case plan is not the only measure by which a court determines whether to grant a motion for permanent custody. Substantial compliance with a case plan, without more, does *not* entitle a parent to custody. *In re Calvert Children*, 9th Dist. Nos. 05-CA 19, 05-CA-20, 2005-Ohio-5653, ¶74. The main issue considered by the courts is not whether the parent has substantially complied with the case plan, but, rather, *whether the parent has substantially remedied the conditions that caused the child's removal. Calvert*, *supra*; *In re Palladino*, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, ¶16. Since the trial court is required to assess the best interests of the child when determining whether to grant a motion for permanent custody, "it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights." *Calvert, supra.*

{¶104} While Lanny has made some progress with his goals, the evidence supported a finding that he has *not substantially remedied the conditions that caused J.H.'s removal.* First, although Lanny said he has filed for divorce and intends to keep away from Amber, she told her case workers and the guardian ad litem that she and Lanny plan to reunite after Lanny gets custody. Further, Lanny confirmed this plan to Julie Gembus of Help Me Grow. Moreover, Lanny admitted that he and Amber are still in contact with each other after he was confronted with text messages he recently sent her, although he admitted their relationship is harmful to J.H.

{¶105} Second, while Lanny's attendance at Help Me Grow was good, Ms. Gembus testified she does not believe Lanny would have the parenting skills necessary to raise J.H. She said that even if Amber was no longer living with Lanny, he would not have the ability to protect J.H. and make appropriate decisions for his safety.

{¶106} Third, while Amber argues Carrie Koenig of Help Me Grow testified that Lanny was able to discuss parenting, Ms. Koenig said this happened only once the day before the custody hearing. In any event, Ms. Koenig said that Lanny does not have the parenting skills necessary to have custody and that it would not be in J.H.'s best interests if Lanny was granted custody.

{¶107} Fourth, while Ms. Flick and Ms. Fuerst of JFS said Lanny has made some progress on his case plan goals, they both said he is unable to parent J.H.

{¶108} Fifth, Amber argues that Lanny has arranged for day care in that his mother and sister could care for J.H. while he is at work. However, Lanny told Ms. Flick that he could *not* count on his mother and sister to care for J.H. For that reason, Ms. Flick told him he would have to arrange for day care with an agency. Although she reminded him constantly to contact an agency, it took him *ten months* to do so.

{¶109} Sixth, although Lanny attended many visits with J.H. in 2012, he also cancelled many (seven as of September 2012) due to alleged car problems and repeatedly cut his visits short (13 times as of September 2012) because, he said, he had to go to work. Amber argues JFS should have scheduled visitation around Lanny's schedule; however, *Lanny agreed to the visitation schedule* and *never asked that his hours be changed*.

{¶110} Seventh, Dr. Kanter testified that if Lanny and Amber were together, they could not competently care for J.H.

{¶111} Eighth, Amber does not challenge Ms. Klammer's recommendation that custody not be granted to Lanny or Eva.

{¶112} Further, "[a parent] is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the [child's] removal. *In re L.M.*, 11th Dist. No.

27

2010-A-0058, 2011-Ohio-1585, ¶50. Here, Amber concedes that Lanny is still not adequately trained to raise J.H., although JFS provided parenting training to him for two years. In *In re A.L.A. and A.S.A.*, 11th Dist. Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, this court held that the mother was not entitled to more than the one and one-half years that had elapsed since the case plan in that case was filed. *Id.* at ¶108. Here, neither Lanny nor Amber asked the trial court to give Lanny more time to reunify with J.H. so the issue is waived. In any event, since the case plan was adopted two years ago, the court did not err in not giving Lanny more time to reunify.

{¶113} Thus, the trial court's findings regarding J.H.'s relationships with Lanny and Eva and regarding J.H.'s need for a legally secure placement were supported by competent, credible evidence.

{¶114} Amber's third and fourth assigned errors are overruled.

{¶115} For her fifth and final assignment of error, Amber alleges:

{¶116} "The trial court abused its discretion by granting the Department permanent custody since the Department failed to meet the requirements of reasonable efforts to reunite [J.H.] with his Father, pursuant to R.C. 2151.414 [sic]."

{¶117} Pursuant to R.C. 2151.419, JFS was required to make reasonable efforts to eliminate J.H.'s continued removal from his home. The court found that "reasonable and diligent efforts have been made to avoid the continued removal" of J.H.

{¶118} Amber argues the trial court abused its discretion in granting permanent custody to JFS because, she contends, there is no evidence it made reasonable efforts to reunite J.H. with Lanny. However, the record is replete with evidence of such efforts on Lanny's behalf: (1) In July 2010, when Amber threatened to kill Eva by slicing her throat, JFS social worker Colleen Connors asked Lanny if he would take J.H. for his

28

protection. Lanny refused. (2) The case plan included goals to address Lanny's mental health issues, parenting, safe and stable housing, and domestic violence. (3) Ms. Fuerst scheduled monthly meetings to monitor Lanny's progress with his goals. (4) Dr. Kanter performed a mental health assessment for Lanny. (5) JFS referred Lanny to Help Me Grow to assist him with parenting skills. (6) Ms. Fuerst made home visits to Lanny's mother's house to identify safety issues in the house to assist Lanny in meeting his safe-and-stable-housing goal. (7) JFS referred Lanny to a marriage counselor. (8) When marriage counseling failed due to Lanny's continued acts of domestic violence, JFS then referred him to an individual counselor. (9) JFS granted Lanny visitation aimed at reuniting him with J.H. After one year of supervised visitation, in June 2011, JFS increased Lanny's visitation to unsupervised visits to promote reunification with Lanny. In May 2012, JFS further increased Lanny's unsupervised visitation to twice a week. (10) In April 2012, JFS withdrew its first motion for permanent custody to give Lanny more time to address his case plan goals.

{¶119} We therefore hold the court's finding that JFS made reasonable efforts to avoid continued removal of J.H. was supported by competent, credible evidence.

{¶120} For the reasons stated in this opinion, Amber's assignments of error are overruled. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas, Juvenile Division, is affirmed.


DIANE V. GRENDELL, J.,

THOMAS R. WRIGHT, J.,

concur.


29