**[Cite as *In re A.C.*, 2014-Ohio-4918.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.C.
      D.M.

C.A. No.     27328

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 12-02-0118
                  DN 12-02-0119

DECISION AND JOURNAL ENTRY

Dated: November 5, 2014

WHITMORE, Judge.

{¶1}    Appellant, Ashley J., ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor children, A.C. and D.M., and placed them in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I

{¶2}    Appellant is the mother of A.C., born August 17, 2006, and D.M., born October 1, 2009. Douglas C. is the father of A.C., and Dewayne M. is the father of D.M. Mother and Dewayne M. also had another child, I.M., born June 5, 2013. That child's custody is not at issue in the current appeal. Both fathers participated to varying degrees in the trial court proceedings, but neither father has appealed from the judgment of the trial court.

{¶3}    A.C. had previously been removed from Mother's custody upon an adjudication of dependency in a 2008 case. At that time, there were concerns that Mother was using illicit

drugs, had untreated mental health issues, and had left the child in the care of others for extended periods of time. A.C. was placed with her father, Douglas C., until he was incarcerated for a burglary conviction in April 2011, at which time Mother regained custody of the child.

{¶4} Nine months later, based again on reports of drug abuse and child neglect, police conducted a welfare check at Mother's apartment. It is unclear from the record whether Dewayne M. resided with the family at this time, although Mother later testified that she had been in a relationship with him for six years and resided with him at the time of the permanent custody hearing. Five-year-old A.C. opened the door for the police. Mother was "semi-unresponsive" and in possession of Percocet that was not prescribed to her. Mother was arrested and later convicted of aggravated possession of drugs. She was sentenced to 12 months of community control. Additional charges for child endangerment were dismissed. The children were taken into custody pursuant to Juvenile Rule 6, but they were returned to Mother upon her agreement to participate in a voluntary case plan with CSB.

{¶5} During the following month, Mother failed to comply with CSB's requests for drug screens or to otherwise begin services under the voluntary case plan. Therefore, CSB filed a dependency complaint on February 14, 2012. The complaint alleged that Mother continued to use drugs, even in the presence of her children, and left drugs accessible to them. The complaint further alleged that Mother often left the children unsupervised or with the maternal grandmother who also used drugs, and Mother failed to provide for the children's needs. Five-year-old A.C. was sometimes left to care for two-year-old D.M. and fed him potato chips. Following an initial hearing, the trial court permitted the children to remain in Mother's custody with protective supervision to CSB.

{¶6}    At the adjudicatory hearing, Mother and Dewayne M. stipulated to the truth of the facts in the complaint.  On that basis, the trial court found the children to be dependent.  At the dispositional hearing in May 2012, the trial court continued the children in the custody of Mother subject to the protective supervision of CSB.

{¶7}    All three parents were given case plans.  Mother's case plan focused on substance abuse; counseling to address parenting skills, coping skills, and trauma from domestic violence; and participating in the Stop the Cycle program.  Dewayne M.'s case plan required him to follow the terms of probation from a September 2011 domestic violence conviction, and it also addressed substance abuse, anger management, and mental health issues.  Douglas C.'s case plan focused on substance abuse, housing, and abstaining from criminal behavior.

{¶8}    Four days after the dispositional hearing, CSB sought emergency temporary custody of D.M.  A.C. was not included in the order because she was with the maternal great grandmother visiting family in Georgia at the time.  The basis for the motion was that Mother was unable to provide safe and stable housing for the children.  Following her conviction for aggravated possession of drugs, Mother had lost her Akron Metropolitan Housing Authority housing.  She and D.M. began staying with the child's paternal grandfather, but soon Dewayne M. and two grandmothers also moved into the home.  Mother stated that the new residents were using drugs and a domestic violence incident occurred between her and Dewayne M.  Mother planned to leave that home and to move into a home with four children and seven adults, one of whom was a registered sexual offender.  Mother refused to accept an available space at a shelter as an alternative.  A safety plan was implemented whereby Mother and D.M. would remain with the paternal grandfather and the new residents would leave.  Notwithstanding this, the paternal

grandfather was about to be evicted. On these facts, the trial court granted CSB's motion for emergency temporary custody of D.M., pending further hearing.

{¶9}   D.M. had a brief, and unsatisfactory,[1] placement with a paternal great aunt. He joined A.C. in a placement with the maternal great grandmother by early July 2012. The agency retained protective supervision. By August 8, 2012, the maternal great grandmother found herself overwhelmed by the level of care required by the two young children and requested that they be removed. She also had conflicts with Mother and Dewayne M. These parents had made insufficient progress on their case plans to warrant a return of the children, and there were no other suitable relatives available to assume care of them. The court then granted temporary custody to CSB, which placed the children in a foster home.

{¶10} Over the course of eight months, all three parents were unsuccessful in their efforts to address their case plans. For her part, Mother completed a substance abuse evaluation and was diagnosed with opioid dependence, heroin, but failed to complete the recommendations in her evaluation. In quick order, she was discharged from two counseling centers for noncompliance. The guardian ad litem was unable to contact her for three full months. Next, Dewayne M. was advised to engage in an opioid-specific intensive outpatient program that had three phases. He reached only the first step of the first phase before he was unsuccessfully terminated from Oriana House and incarcerated on his suspended sentence for domestic violence. He tested positive for opioids and marijuana on October 16, 2012. And finally, Douglas C. was released from prison in November 2012, but failed to accomplish any of the

---

[1] D.M.'s behavior was said to have changed significantly while he was with the paternal great aunt. He became withdrawn and shy, and he claimed that she burned him with a cigarette. In addition, there were visitation problems. The aunt permitted Dewayne M. to visit, but not Mother. This relative later sought legal custody, but both children firmly indicated that they did not want to live with her.

objectives on his case plan. He visited with A.C. only three times, and his last visit was in March 2013. During those visits, A.C. clung uncomfortably to the caseworker.

{¶11} Accordingly, in January 2013, the trial court denied CSB's motion for an extension of temporary custody, finding insignificant progress by the parents on their case plans. Given these negative developments, CSB moved for permanent custody on April 8, 2013. As the parties prepared for a permanent custody hearing, the guardian ad litem filed a motion with the juvenile court, requesting the appointment of an attorney to represent the wishes of the children because their "wish to return to the custody of [Mother]" conflicted with her view that permanent custody was in their best interests. The trial court granted the motion and appointed an attorney to "represent the wishes of the children."

{¶12} Two months later, Mother seemed to have turned things around. Because she was pregnant, the caseworker had been able to get Mother readmitted to a substance abuse counseling program that had previously discharged her upon the condition that she first go to a hospital for detoxification and a full evaluation. Mother was reluctant, but eventually agreed. Having admitted to using and experimenting with opioids for five years off-and-on, the hospital released Mother on Subutex, an opioid substitute for the treatment of addiction in pregnant women. Mother made progress in the treatment of substance abuse as well as mental health issues and successfully completed the Touchstone Program, residing there from March 27 to June 27, 2013. I.M. was born on June 5, 2013. Upon leaving Touchstone, Mother and the infant resided with the maternal great grandmother, and Mother was on a waiting list for housing. The agency saw the great grandmother as a supportive family member and her home as safe, clean, and appropriate. Mother had been sober for six months, as reflected by twice weekly drug tests. She completed the Stop the Cycle program and planned to continue her substance abuse treatment

with aftercare. Visits were expanded and overnight visits were taking place in the great grandmother's home on weekends. Mother completed her community control in May 2013 and had had no legal problems since January 2012.

{¶13} As to Dewayne M., he obtained an early release from prison in July 2013. He began substance abuse counseling at the end of September 2013, and began a Methadone program in November 2013, for an opioid addiction. His counselor attempted to focus on relapse prevention skills, including making better choices and identifying his triggers.

{¶14} With these improvements, CSB withdrew its pending motion for permanent custody in June 2013. The agency again sought an extension of temporary custody, and the trial court granted this extension. In September 2013, CSB moved to modify temporary custody to protective supervision based on Mother's significant case plan progress. The children were being prepared to return home and were looking forward to that.

{¶15} By October 2013, however, conditions deteriorated again. Mother was forced to leave the maternal great grandmother's home when she accused Mother of theft. Mother admitted that she took money from her, only disputing the amount. Mother tested positive for opioids on August 5, 2013, September 9, 2013, and October 21, 2013. Mother's Touchstone counselor believed she needed inpatient treatment and Mother agreed, but instead opted for an outpatient program and began residing with Dewayne M. For his part, Dewayne M. had two positive drug screens for amphetamines in August 2013. He failed to complete a substance abuse evaluation, had no independent housing, and had no verifiable source of income. Consequently, infant I.M. was removed from his parents' custody, and, on November 5, 2013, CSB sought permanent custody of A.C. and D.M.

{¶16} Following a hearing, the trial court granted CSB's motion for permanent custody. Mother has appealed and has assigned three errors for review.

II

Assignment of Error Number One

THE TRIAL COURT ABUSED ITS DISCRETION AS A MATTER OF LAW WHEN IT GRANTED PERMANENT CUSTODY TO SUMMIT COUNTY CHILDREN SERVICES DESPITE ITS NOT ASCERTAINING THE WISHES OF THE CHILDREN FROM EITHER THE CHILDREN OR THE GUARDIAN AD LITEM[.]

Assignment of Error Number Two

THE TRIAL COURT ABUSED ITS DISCRETION AS A MATTER OF LAW WHEN IT GRANTED PERMANENT CUSTODY TO SUMMIT COUNTY [CHILDREN] SERVICES, AS ITS DECISION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

Assignment of Error Number Three

THE TRIAL COURT ABUSED ITS DISCRETION AS A MATTER OF LAW AND COMMITTED PLAIN ERROR WHEN IT CONSIDERED THE GUARDIAN AD LITEM'S REPORT IN GRANTING PERMANENT CUSTODY TO SUMMIT COUNTY [CHILDREN] SERVICES, WHEN THE GUARDIAN AD LITEM HAD FAILED TO COMPLETE HER DUTIES UNDER THE LAW[.]

{¶17} Mother's three assignments of error will be considered together because they are related. In her second assignment of error, Mother has argued that the judgment granting permanent custody is against the weight of the evidence because she and Dewayne M. substantially complied with their case plans. In her first and third assignments of error, Mother has asserted that the trial court erred in granting permanent custody to CSB because it did not have evidence of the wishes of the children, and that the trial court erred in considering the report of the second guardian ad litem because the report did not contain such evidence.

**{¶18}** R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to terminate parental rights and award permanent custody of a child to a proper moving agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### First Prong of Permanent Custody Test

**{¶19}** The trial court found that the first prong of the permanent custody test was satisfied on three alternative grounds: (1) the children had been in the temporary custody of CSB for at least 12 of the prior 22 months, *see* R.C. 2151.414(B)(1)(d); (2) the children should not be placed with Mother because she failed to remedy the conditions that brought the children into care, *see* R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1); and (3) the children should not be placed with Mother or Dewayne M. because they both have chemical dependencies so severe that they are unable to provide the children with an adequate permanent home, *see* R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(2). In addition, the trial court found that Douglas C. had abandoned A.C. *See* R.C. 2151.414(B)(1)(b) and R.C. 2151.414(E)(10).

**{¶20}** Mother does not directly challenge any of these first prong findings, but rather claims that the judgment granting permanent custody is against the weight of the evidence because she and Dewayne M. substantially complied with their case plans. This Court has repeatedly emphasized that substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous. *See, e.g., In re M.Z.*, 9th

Dist. Lorain No. 11CA010104, 2012-Ohio-3194, ¶ 19. Rather, the termination of parental rights is governed by the provisions of R.C. 2151.414.

{¶21} To the extent, however, that Mother's claim of substantially completing her case plan challenges the finding that she failed to remedy the conditions that brought the children into care, we find the argument to be without merit for two reasons. First, even if true, the first prong of the permanent custody test would nevertheless be satisfied by either of the alternative findings made by the trial court and left unchallenged by Mother. *See In re M.M.*, 9th Dist. Lorain Nos. 10CA009744, 10CA009745, 10CA009746, 10CA009747, 2010-Ohio-2278, ¶ 12. Second, the record does not, in fact, demonstrate that Mother remedied the conditions that brought the children into care. Although only Mother has appealed, Mother has argued that the decision of the trial court should be reversed on the basis of case plan compliance efforts by both her and Dewayne M. Moreover, Dewayne M.'s status is relevant because Mother apparently plans to reside with him and involve him in parenting the children. Consequently, we consider the case plan compliance efforts of both Mother and Dewayne M.

{¶22} In addition to considering the efforts towards case plan compliance before the filing of the motion for permanent custody as set forth above, we consider the efforts during the four month interval between the permanent custody motion, filed on November 5, 2013, and the permanent custody hearing on March 11, 2014. Mother tested positive for amphetamines on November 13, 2013, and for opioids on November 20, 2013, even though she was attending her second intensive outpatient treatment program at the time and was receiving Methadone. Mother's counselor reported that Mother completed the outpatient program, but she was not compliant with the aftercare program, having missed a recent counseling session and a recent aftercare session. Mother stated that she believed aftercare was voluntary. Mother had no

positive drug test results from November 21, 2013 until the March 11, 2014 permanent custody hearing. However, the caseworker testified that substance abuse was still a concern because Mother was not consistently engaged in treatment and because she was residing with someone who had recently relapsed. For these reasons, Mother's risk of relapse was said to be high. The caseworker believed that Mother had not completed the substance abuse component of her case plan.

{¶23} Mother also failed to complete the requested treatment for mental health issues. Furthermore, Mother resided in eight different places during the course of this case, often losing her housing because of drugs, drug-related problems, criminal behavior, or lack of positive support. She was residing with Dewayne M. at the time of the permanent custody hearing. That was said to be concerning because Dewayne M. pays the rent, but was currently on probation and had a January 2014 theft conviction and a March 2014 positive test result for amphetamines. Mother had no other viable options for housing. Her only income was food stamps. She believed the felony on her record has kept her from getting a job, but also believed that her conviction could be expunged in June 2014. Notably, Mother and Dewayne M. list each other and arguments between them as triggers for their substance abuse. At the hearing, Mother testified that she believes Dewayne M. has changed, that she now trusts him, and that they no longer argue as much, although they do have conflicts involving the children. Mother admitted that his recent positive drug test is cause for concern, but she did not believe his drug use would continue.

{¶24} As to Dewayne M., the record reflects that, at the time of the hearing, he had maintained an apartment for three months, which is the longest he had had housing, and he had been employed by McDonald's for two months. At the same time, he had not completed anger

management or substance abuse treatment as required by his case plan. Most significantly, he had not remained drug free. After starting a Methadone program in September 2013, for control of opioids, he had multiple positive drug test results. He tested positive for marijuana, opioids, and oxycodone on November 4, 2013; for amphetamines on November 5, 2013; for cocaine, amphetamines, and opioids on November 19, 2013; for amphetamines on December 9, 10, and 18, 2013; and for amphetamines on March 6, 2014. He also had a diluted drug test on February 10, 2014, which indicates that he consumed a lot of liquid before the test and the result is inconclusive. Dewayne M.'s counselor explained that Dewayne M., currently 28, started using marijuana at 12, heroin and methamphetamine at 17, and cocaine at 18. His counselor further indicated that addictions to these drugs are among the more difficult to treat. The caseworker stated that Dewayne M. was not close to attaining sobriety, nor had he demonstrated an ability to maintain it. Additionally, Dewayne M. did not obtain a mental health evaluation until January 2014, and had not begun treatment at the time of the permanent custody hearing. Dewayne M. also had not demonstrated compliance with the requirement of refraining from criminal activity and following the rules of his probation.

{¶25} The record fails to demonstrate that Mother and Dewayne M. substantially complied with their case plans. Correspondingly, the evidence clearly and convincingly indicates that Mother failed to remedy the conditions that caused the removal of the children from her care. *See* R.C. 2151.414(E)(1).

### Second Prong - Best Interests of the Children

{¶26} In order to determine the best interests of the children, the juvenile court must consider all relevant factors, including the factors enumerated in R.C. 2151.414(D): the interaction and interrelationships of the children, the wishes of the children, the custodial history

of the children, and the children's need for permanence in their lives. *In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. In her first and third assignments of error, Mother has asserted that the trial court did not have evidence of the wishes of the children regarding placement before it, and that the trial court erred in considering the report of the second guardian ad litem[2] because it did not contain such evidence. For the reasons that follow, we find these arguments to be without merit.

### Interactions and Interrelationships of the Children

{¶27} Both children began attending counseling in the fall of 2012 to address difficulties from the disruptions of their multiple placements and anger issues. Their counselor testified that the structure, consistency and behavior modification of the foster home, as well as affection from the parents and the foster parents, helped the children stabilize and decrease their anger issues. She explained that the children seemed happy, had improved self-esteem, and exhibited no anxiety. A.C. was thriving socially and was receiving outstanding grades. D.M. had decreased his temper tantrums, physical aggression and swearing. He was listening better. The children had made good progress and the counselor was able to close their cases shortly before the permanent custody hearing.

{¶28} The children were strongly bonded to Mother and Dewayne M., and they looked forward to their visits. D.M., in particular, was very attached to his father, Dewayne M., and got upset when he did not come to visits. The children sometimes had difficulties returning to the foster home, although they also had a very strong bond with the foster parents as well. D.M. was also said to be very attached to the foster father. The foster parents were not considering adoption because of their age.

---

[2] As explained below, two individuals served as guardian ad litem in this matter.

**{¶29}** The children's counselor testified that Mother and Dewayne M. interacted appropriately with the children during their weekly visits. The children behaved for them and responded positively to the parents. Mother affectionately offered praise, hugs, and kisses to the children. She also implemented suggestions offered by the counselor. The counselor stated that Dewayne M. was nurturing with the children and had recently done pretty well. However, she stated that he appeared to be under the influence of something at one or two visits and dangerously climbed on top of playground equipment on one occasion.

**{¶30}** Despite this strong bond, the evidence did not demonstrate that the parents had the ability to provide long-term safety and stability for the children. The caseworker testified that although the parents provided some consistency during their two-hour visits, she had concerns about whether such consistency would be maintained if the children were returned home. The guardian ad litem testified similarly, stating that she had no major concerns about visits, but did have a concern regarding Mother's inconsistency in addressing her own case plan appointments. She wondered if Mother would be able to consistently get the children to school, doctor visits, and other appointments and for how long. She was also concerned with the lack of case plan compliance by Dewayne M. In two years, he had made little progress and very recently had a positive drug test result.

**{¶31}** All three parents have histories of drug abuse, criminal behavior, and instability. In addition to a conviction for the aggravated possession of drugs, Mother had only very brief employment at two fast food restaurants and moved at least eight times during this case. She admitted to using heroin since approximately 2007. This case represents Mother's second drug-related involvement with children services in four years. Her oldest child resided out of her care longer than with her.

{¶32} Dewayne M. has a history of drug abuse, including marijuana, cocaine, heroin, and methamphetamines, from the age of 12. His criminal record includes convictions for attempted escape in March 2007, deception to obtain a dangerous drug in December 2009, violating community control in July 2010, domestic violence in September 2011, and again violating community control in December 2012. In July 2013, he was granted judicial release and was placed on community control for two years. Thereafter, on January 23, 2014, he pled guilty to misdemeanor theft and tested positive for amphetamines just five days before the permanent custody hearing. At the time of the hearing, he had maintained an apartment for three months and employment for two months.

{¶33} Douglas C. was convicted of burglary in April 2011, and he was convicted of theft and possession of drug abuse instruments in December 2013. At the time of the permanent custody hearing, his whereabouts were unknown.

{¶34} Besides the maternal great grandmother, who apparently moved out of state, the record does not reveal that the children had significant positive relationships with any other relatives. In particular, A.C. did not have a positive relationship with her father, Douglas C., even though she apparently resided with him from 2008 until 2011. Douglas C. visited with A.C. just three times and had not seen her in a year.

### Wishes of the Children

{¶35} R.C. 2151.414(D)(1)(b) provides that the trial court is to consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child" in determining the best interest of the children.

{¶36} The purpose of a guardian ad litem for a child in a juvenile custody case is "to protect the interest of the child and 'assist a court in its determination of a child's best interest.'"

*In re C.B.,* 129 Ohio St.3d 231, 2011-Ohio-2899, ¶ 14, citing R.C. 2151.281(B) and Sup.R. 48(B)(1). In this role, the guardian shall "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to * * * [filing] any motions and other court papers that are in the best interest of the child[.]" R.C. 2151.281(I). *See also* Sup.R. 48(B)(1) and (D)(1). Where, however, a conflict exists between what the guardian believes is in the child's best interest and the child's wishes regarding placement, the child is entitled to independent counsel. *See In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, syllabus, and *In re C.B.,* 129 Ohio St.3d 231, 2011-Ohio-2899, ¶ 17.

{¶37} In the present case, the guardian ad litem who was initially appointed to this matter was not an attorney and she recognized such a conflict to exist. She, therefore, filed a motion seeking the appointment of independent counsel to represent the wishes of the children, specifically explaining that the children wanted to return to Mother while she believed their best interests would be served by an order of permanent custody. No one opposed the motion, and the trial court granted it. At this point, the responsibilities of the guardian ad litem and those of the attorney for the children became distinct.

{¶38} The role of the guardian ad litem was to investigate the children's situation and then ask the court to do what the guardian feels is in the children's best interest, while the role of the attorney was to determine and represent the children's wishes within the bounds of the law. *See In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232 (1985). The children's attorney represented the children for nine months before the permanent custody hearing and then participated in the permanent custody hearing by examining witnesses and presenting arguments to the court. She did not appeal from the decision of the trial court.

{¶39} Three weeks before the permanent custody hearing, the original guardian ad litem requested permission to withdraw from her appointment in this case because of an employment opportunity and the trial court permitted her to do so. The trial court immediately appointed another guardian to represent the best interests of the children. While a change of the guardian ad litem at such a late date in the proceeding is unfortunate and unusual, Ohio statutes and juvenile rules appear to anticipate the occasional need for replacement of a guardian ad litem. *See* R.C. 2151.281(G)(6) (the guardian ad litem or a replacement shall serve until resignation or removal by the court) and Juv.R. 4(F) (the guardian ad litem may withdraw only with the consent of the court upon good cause shown). In any event, the trial court permitted the withdrawal, and no party opposed the withdrawal or the replacement.

{¶40} The second guardian ad litem served on this case for three weeks. She filed a written report before the permanent custody hearing. At the hearing, she explained that she familiarized herself with the case by reviewing prior reports, contacting the caseworker, observing Mother and Dewayne M. interact with the children at two visits, meeting with Mother at her residence, and reading much of the unofficial court file. She reported that the visits and home were generally appropriate. She expressed concerns, however, with the inconsistency of Mother and Dewayne M. over the course of two years. She explained that during her short time on the case, she did not have an appropriate opportunity to discuss the children's wishes with them. She admitted that she would have liked to have had more time on the case, but also asserted that she did not need more time in order to be confident in her recommendation. After concluding her investigation, she felt confident in recommending that permanent custody was in the best interests of the children.

{¶41} In the trial court's opinion, the judge noted the guardian ad litem's recommendation that permanent custody was in the best interest of the children, while also recognizing D.M's desire and A.C.'s conflicted desire to return to Mother. On the basis of all the evidence before her, the trial judge concluded that it was in the best interests of the children to be placed in the permanent custody of CSB.

{¶42} In her first assignment of error, Mother has argued that the trial court erred in granting permanent custody to CSB when it did not have evidence of the wishes of the children as derived from either the children or the second guardian ad litem. For the following reasons, we find this argument to be without merit.

{¶43} First, Mother has failed to demonstrate prejudice in the failure of the second guardian ad litem to ask the children their wishes for placement or in the lack of direct testimony by the children, either in camera or in court. The trial judge acknowledged the children's desire to return to Mother in reaching her decision. Their desire to return home was, therefore, part of the trial court's consideration in arriving at a determination of the best interests of the children. At trial, Mother did not proffer any wishes of the children that were different from those found by the trial judge, nor has she suggested any on appeal. Consequently, Mother has not demonstrated prejudice in the failure of the second guardian ad litem to inquire of the children or in the failure of the children to testify directly regarding their wishes for placement.

{¶44} Second, the record establishes that the trial court appointed an attorney to represent the children for the very reason that they wished to return to Mother and the opinion of the original guardian ad litem as to their best interests conflicted with that view. The children's attorney served as the legal representative of their personal interests and wishes for nine months and she continued in that role throughout the permanent custody hearing. She never indicated

that the children's wishes had changed, and she did not request to withdraw from the case. The record, therefore, demonstrates that the children's wishes were known to the trial court by way of the original guardian ad litem's motion for the appointment of independent counsel for the children and thereafter through their attorney. Accordingly, Mother's argument regarding a lack of evidence of the children's wishes is without merit.

{¶45} In her third assignment of error, Mother has asserted that the trial court committed plain error in considering the report of the second guardian ad litem because the guardian did not fulfill her role as set forth under Sup.R. 48, most particularly, to ascertain the wishes of the children. *See* Sup.R. 48(D)(13)(c). Mother's argument does not go to the admissibility of the report, but rather to its weight. The guardian ad litem's testimony was subject to cross-examination by all parties. Mother's attorney took the opportunity to highlight perceived deficiencies in her investigation. The trial judge, as trier of fact, was permitted to believe or disbelieve the guardian's testimony, to assign it whatever weight she deemed appropriate, and to consider it in the context of all the evidence before the court. As noted above, independent counsel was appointed to represent the children's wishes, and the trial court considered their wishes in arriving at a full determination of their best interests. Accordingly, Mother's argument that the trial court erred in considering the report of the guardian ad litem is not well taken.

{¶46} Finally, we must emphasize that the wishes of the children are but one of the best interest factors for the consideration of the trial court in determining the best interests of the children. The fact that the children wished to return to Mother is not dispositive when considering the children's best interest. Although the trial court was required to consider each of the statutory best interest factors, no single factor is given greater weight or heightened importance and the trial court is required to weigh the totality of evidence on all of the factors to

reach a best interest decision. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56, 63-64. *See also In re C.G.*, 9th Dist. Summit Nos. 24099 & 24097, 2008-Ohio-3773, ¶ 28.

## Custodial history

{¶47} Absent evidence in the record to the contrary, we presume that A.C. resided with Mother for two years until she was removed from Mother's custody in the 2008 dependency case. A.C. was then placed in the custody of her father, Douglas C., until he was incarcerated in April 2011, at which time Mother regained her custody. Ninth months later, the present case regarding both children began on a voluntary basis. After one more month, the agency initiated a dependency case in juvenile court. The children remained in Mother's care under the protective supervision of the agency for four months. The agency then attempted two brief relative placements before obtaining temporary custody of the children and placing them in foster care. The children spent five weeks in one foster home. When those foster parents could no longer meet the behavioral needs of the children, the children were placed in a therapeutic foster home and they remained there for 16 months.

## Legally secure permanent placement

{¶48} There was evidence before the trial court that the children were in need of stability and there were no suitable friends or relatives willing to provide for their long-term care. A child center recruiter searched through more than 20 relatives and made many attempts to find a relative placement for the children. Placement of D.M. with a paternal great aunt was unsuccessful. That relative volunteered to assume legal custody, but both children indicated that they did not want to reside with her. The maternal great grandmother also attempted to care for the children, but was not able to do so on a long-term basis.

{¶49} At the time of the permanent custody hearing, Mother had accomplished three months of sobriety, but the caseworker did not believe she was in a better position than when she had earlier accomplished six months of sobriety and then relapsed. During the previous period, Mother was taking Subutex, completed an inpatient program, resided with the great grandmother, and Dewayne M. was incarcerated. Most recently, Mother achieved three months of sobriety and was taking Methadone, but missed counseling and aftercare sessions, and declined a recommended inpatient program in favor of residing with Dewayne M. who had multiple positive drug test results over that same period of time.

{¶50} The children's counselor believed it would be very difficult for the children to go to another home, but also explained that if the children were returned to a home that was not stable or consistent, that they would be adversely affected. The caseworker similarly acknowledged that the children would experience some grief if permanent custody is granted, but that their current caregivers are willing to help them through the process and the agency would also assist if needed.

{¶51} Mother and the children obviously share a strong bond and she clearly loves them, but it is evident that the trial court's decision reflects the concern that these children were in need of safety and stability which could not be achieved absent the grant of permanent custody. Mother was given many opportunities to maintain or regain custody of her children, but she failed to take advantage of them. The concerns that initially brought the children to the attention of the agency have not been resolved. Notwithstanding brief periods of sobriety, the record reflects that Mother has not demonstrated the ability to sustain stability or consistency. At the time of the permanent custody hearing, Mother resided with a man who himself has substance abuse issues and recently tested positive for amphetamines. The evidence fails to demonstrate

that a legally secure permanent placement can be achieved without a grant of permanent custody to the agency.

{¶52} Upon careful review of the record, the trial court did not err in finding that permanent custody is in the best interests of the children. Additionally, the trial court's judgment terminating the Mother's parental rights is not against the weight of the evidence. Mother's three assignments of error are overruled.

### III

{¶53} Mother's three assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                                        _____
                                        BETH WHITMORE
                                        FOR THE COURT

BELFANCE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

KANI HARVEY HIGHTOWER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.