[Cite as *In re Ka.R.*, 2024-Ohio-5302.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

In re:  Ka.R. and Ke.R.,

Adjudicated Neglected/Dependent
Children.

:
:
:
:
:
:
:
:
:
:

Case No. 24CA4057

<u>DECISION AND JUDGMENT
ENTRY</u>

**RELEASED: 10/29/2024**

───────────────────────────────────────────────────────────
<u>APPEARANCES:</u>

Valerie M. Webb, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecutor, and S. Andrew Sturgill, Scioto County
Assistant Prosecutor Portsmouth, Ohio, for appellee.
───────────────────────────────────────────────────────────

Wilkin, J.

{¶1} Appellant, F.C., appeals a judgment of the Scioto County Court of Common
Pleas, Juvenile Division, that granted Scioto County Children Services permanent
custody of her two-year-old twin children, Ka.R. and Ke.R.  Appellant raises one
assignment of error that asserts that (1) the trial court's judgment placing the children in
the agency's permanent custody is against the manifest weight of the evidence and (2)
sufficient evidence does not support the court's judgment.  After our review of the record
and the applicable law, we do not find any merit to appellant's assignment of error.
Therefore, we affirm the trial court's judgment.

FACTS AND PROCEDURAL BACKGROUND

{¶2} On May 19, 2021, the agency filed a complaint that alleged the children,
who had been born seven weeks earlier, were "neglected/dependent children."  The
agency asked the court to place the children in its temporary custody and also asked

the court to issue an ex parte temporary custody order.  An affidavit attached to the complaint averred the following.  On April 20, 2021, the agency received a referral regarding the children.  The parents took the two infants, who had been prematurely born, to a pediatrician.  The pediatrician advised the parents "to take the children immediately to the emergency room due to their dangerously low temperature."  Several hours later, the parents still had not taken the children to the emergency room.  Instead, appellant had taken the children to a different doctor's office.

{¶3} The agency caseworker contacted this doctor's office and learned that "the children had been brought in around noon, and the children were treated and sent home with instructions on how to keep their body temperatures up."  The caseworker met with appellant, and appellant stated that "the children were now OK, and her instructions were to wake the children up every two hours to eat, keep them bundled and warm, and return to the doctor in two days."

{¶4} On May 4, 2021, Ka.R.'s pediatrician examined him and found that the child had "a temperature of 81 and was showing signs of skin breakdown and redness on his bottom."  The child "began to 'code' at the office; he was given CPR and taken to the ER where he was intubated before being" life-flighted to Nationwide Children's Hospital.

{¶5} The caseworker went to the family's home to check on the other child, Ke.R.  The caseworker discovered that Ke.R. "was cold to the touch."  The putative father agreed to have the child taken to the emergency room.  Ke.R. subsequently was life-flighted to Nationwide Children's Hospital.

{¶6} A hospital psychologist evaluated the parents and reported that "they are at the 4th grade level." The psychologist expressed concern "with the parents' ability to provide the care that the children need."

{¶7} The trial court subsequently placed the children in the agency's temporary custody pending adjudication and disposition.

{¶8} On June 28, 2021, the court adjudicated the children "neglected/dependent" children. The court later entered a dispositional order that placed the children in the agency's temporary custody.

{¶9} On February 3, 2023, the agency filed a motion that asked the court to modify the disposition to permanent custody. The agency alleged that the children have been in its temporary custody for 12 or more months of a consecutive 22-month period and that placing the children in its permanent custody is in their best interest.

{¶10} On March 29, 2023, the court held a hearing to consider the agency's permanent custody motion. Dr. Kerry Rosen, a pediatric cardiologist, testified as follows. On May 4, 2021, Ka.R., who had been diagnosed with a rhythm abnormality, arrived at Southern Ohio Medical Center Pediatrics for a scheduled routine visit. Upon examination, Dr. Rosen discovered that the child "was actually fairly near unresponsive," was "very cold," had an "abnormally low temperature," and had a low heart rate. Thus, the routine office visit turned into an emergency visit, with the child ultimately being life-flighted to Nationwide Children's Hospital.

{¶11} Dr. Rosen reported that he had "never seen a baby show up for a routine office visit in that sort of dangerous of [sic] situation." He stated that it gave him and the medical team concerns for the child's "long-term welfare." Dr. Rosen indicated that

most parents "would have recognized the concerns, the grave concerns," and would have sought immediate medical care rather than presenting the child for a routine office visit.

{¶12} In September 2022, Dr. Rosen wrote a letter to the agency "to share some of [the medical] team's observations about [the] family showing up for visits and their . . . interactions and involvement with the visits." He stated that appellant "had no eye contact or questions" and that she "was not very engaged within the appointment." Additionally, appellant attended only about half of the child's medical appointments. Dr. Rosen explained that he continues to treat Ka.R. and remains concerned about appellant's lack of engagement.

{¶13} Dr. Rosen testified that Ka.R.'s twin, Ke.R., also was brought to the hospital in dire shape. He stated that both Ka.R. and Ke.R. had a serious infection that required life-supporting care. Dr. Rosen elaborated that the children "had acute, renal kidney failure" and required "a form of dialysis."

{¶14} Brinley Curtis, a family support specialist with Help Me Grow, testified that she worked with appellant for approximately one year and last saw appellant in October 2022, during a supervised visit at the agency. Curtis explained that she worked with appellant to help her learn how "to interact positively with the children." Curtis reported that appellant appeared "uncomfortable" playing with the children on the floor, and during every visit, she seemed "overwhelmed." Curtis does not believe that appellant can manage caring for the two young children, plus a third child due to be born in July 2023.

{¶15} Caseworker Emma Liles[1] testified as follows.  The agency's initial concerns regarding the family involved "the parents' lack of understanding for caring for" the two prematurely born children.  Additionally, appellant tested positive for marijuana when she delivered the children.  The agency also had concerns that the home environment was unsanitary.

{¶16} The agency developed a case plan to help address these issues.  The case plan required the parents to (1) expand "their knowledge for caring for infants," (2) follow "doctors' orders," (3) take the doctors' orders "seriously," (4) learn "signs of medical illnesses," (5) undergo psychological evaluations, and (6) maintain a clean home.  The case plan also required the parents to (1) obtain a drug and alcohol assessment and follow any treatment recommendations and (2) submit to random drug screens.  The children's father "did not complete any services and didn't express any interest in working a case plan."

{¶17} Liles had concerns regarding appellant's "parenting skills and knowledge for caring for infants."  For example, appellant was "unable to change diapers appropriately," did not know "when the children needed to be fed," kept the children "in their car seats the majority of the visits," and returned the children to the foster home in dirty diapers.  Liles observed "slight improvements" as the case progressed, but when Liles tried to redirect appellant, appellant became "verbally aggressive."  Thus, Liles indicated that "there was very little change."

---

[1] The transcript of the permanent custody hearing spells the caseworker's last name as "Lyles."  We have used the spelling that appears in the trial court's judgment entry.

{¶18} The children have been placed in multiple foster homes due to changes in the foster parents' status as adoptive placements, but they now are in a possible adoptive placement.

{¶19} Liles stated that the agency sought permanent custody of the children due to appellant's lack of appropriate parenting skills and inconsistency in attending visits with the children and the children's doctor appointments. She explained that appellant attended 45 visits with the children and canceled 30 visits. Liles indicated that the agency had concerns about the children's safety if they were left unsupervised with appellant.

{¶20} Liles discussed the case plan goals with appellant at least once each month. Appellant did not complete a drug and alcohol assessment, but she had completed two drug screens that were "negative for all substances." Appellant completed a mental health assessment but she did not follow treatment recommendations. Liles did not believe that appellant's "parenting skills and knowledge have improved enough for her to care for [the children's] basic and safety needs" or that appellant can provide the children with "stability and consistency."

{¶21} Liles additionally informed the court of "a critical safety incident" that occurred at appellant's home in November 2022. Liles reported that appellant had picked up a "friend who was too drunk to drive and drove him to [her] residence." This friend "was playing with a firearm in [appellant's] bedroom and ended up shooting himself in the head." Liles stated that this incident caused "several concerns," including appellant "allowing any individual to play with a firearm in her presence." Liles discussed the incident with appellant to relay the agency's concern that appellant had

allowed this individual into her home.  Appellant did not seem to understand the reason for the agency's concern.

**{¶22}** After Liles's testimony, the court continued the hearing until November 6, 2023.  At the start of that hearing, the court noted that appellant was not present and that the court previously had continued a September 15, 2023 hearing date due to appellant's failure to appear, which at that time, was ostensibly due to an illness and a flat tire.  The court further noted that before the November 6, 2023 hearing, appellant had sent a text message to an agency case aid who manages supervised visitation.  Appellant's message asked if the agency would change her visitation day.  The message did not mention the permanent custody hearing that had been scheduled to resume on November 6, 2023.  One of the agency caseworkers further stated that appellant had informed the agency that she was sick, but she still did not mention the hearing.  The court denied appellant's counsel's motion to continue and proceeded with the hearing.

**{¶23}** Caseworker Teresa Patrick testified as follows.  She was the family's caseworker from June 2021 through January 2022.  The initial case plan required appellant to (1) complete parenting classes, (2) undergo a mental health assessment, and (3) obtain a drug and alcohol assessment.

**{¶24}** The agency had concerns for the children's safety.  Appellant "struggle[ed] to be attentive to both children," and Patrick needed to prompt appellant to change the children's diapers.  During one of the visits, appellant "walk[ed] away from a child on [the] diaper changing table" and did not provide "safety for the children."  Appellant also

"gave chocolate to the children and these [children] were infants." Additionally, appellant became "frustrated" because "she didn't know how to soothe the children."

{¶25} Patrick discussed the agency's concerns with appellant, and appellant "was argumentative and did not feel that there [were] any problems." Patrick "was very concerned for the safety of the children if the children were returned to" appellant.

{¶26} Caseworker Brandon Dunn testified as follows. He has been the family's caseworker since March 2023. Since that time, the agency's concern remained appellant's "lack of ability to appropriately parent and the lack of her ability to maintain any form of consistency with regard to the children to move to a point where [the agency] could attempt" reunification. The agency has temporary custody of appellant's third child born during the pendency of Ka.R.'s and Ke.R.'s cases and is working on reunifying the child with appellant.

{¶27} The children "are thriving" in the current foster placement and receiving the services that they need to continue a healthy growth pattern. If the court grants the agency permanent custody, the foster parents intend to adopt the children.

{¶28} Dunn firmly believes that placing the children in the agency's permanent custody is in their best interest. He stated that since he took over the case in March 2023, he has not seen any change in appellant's behavior. Dunn explained that at the time of the November 2023 hearing, the case was nearly three years old, and appellant has not shown any "commitment to a case plan or to truly work reunification." Additionally, the agency offered appellant over 100 visitation opportunities, and she attended only half of them. Appellant's last visit with the children occurred in July 2023.

{¶29} Cortney Brumley, the children's guardian ad litem (GAL), testified and recommended that the court place the children in the agency's permanent custody. Brumley indicated that she does not have confidence that appellant "is able to meet the minimum sufficient level of care to provide the basic safety needs . . . for the children." She further reported her concerns regarding appellant's "lack of visitation" and "lack of attending medical appointments."

{¶30} Brumley stated that the children are "doing really well" in the current foster home and are "thriving." She explained that the children are receiving necessary services, "being loved and supported," and having their safety and medical needs met. Brumley also observed that the children appear bonded with the foster family and are happy.

{¶31} On December 11, 2023, the trial court granted the agency permanent custody of the children. The court found that the children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period and that placing them in the agency's permanent custody is in their best interests.

{¶32} With respect to the children's interactions and interrelationships, the court found that appellant's relationship with the children is "minimal" and that she "does not engage with the children." The court also noted that appellant attended "only half" of her visitation opportunities and that when she did attend, she often appeared disengaged.

{¶33} Regarding the children's wishes, the court stated that the children are too young to express their wishes.

{¶34} The court also considered the children's custodial history and observed that before their removal, the children had been in the parents' custody.

{¶35} The court further determined that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the agency permanent custody of the children.  The court found that appellant "seems disinterested in the children."  The court pointed out that she attended only half of the visitations available, "skipped out on most of the out-of-town medical appointments," and "missed most of the local appointments."  The court also noted that when the mother attended medical appointments, "she failed to engage with the provider."  The court stated that appellant "needed prompting on the care [that] the children required, even for the most basic needs."

{¶36} The court thus concluded that placing the children in the agency's permanent custody is in their best interests and granted the agency permanent custody of the children.  This appeal followed.

ASSIGNMENT OF ERROR

THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY OF THE CHILDREN TO SCIOTO COUNTY CHILDREN SERVICES WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶37}  In her sole assignment of error, appellant asserts that the trial court's judgment is against the manifest weight of the evidence and that sufficient evidence does not support its judgment.  More specifically, appellant contends that the trial court's finding that awarding the agency permanent custody of the children is in their best interest is against the manifest weight of the evidence.  Appellant claims that the evidence presented at the hearing shows that she had continued "to work on necessary

services pursuant to the case plan for the period of time up to and including the filing of"

the permanent custody motion.

STANDARD OF REVIEW

{¶38} Generally, a reviewing court will not disturb a trial court's permanent

custody decision unless the decision is against the manifest weight of the evidence.[2]

*E.g., In re B.E.*, 2014-Ohio-3178, ¶ 27 (4th Dist.); *In re R.S.*, 2013-Ohio-5569, ¶ 29 (4th

Dist.).  When an appellate court reviews whether a trial court's permanent custody

decision is against the manifest weight of the evidence, the court """weighs the evidence

and all reasonable inferences, considers the credibility of witnesses and determines

whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and

created such a manifest miscarriage of justice that the [judgment] must be reversed and

a new trial ordered."""  *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v.

Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001), quoting *State v. Thompkins*, 78 Ohio

St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.

1983).  We further observe, however, that issues relating to the credibility of witnesses

and the weight to be given the evidence are primarily for the trier of fact.  As the court

explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):  "The

underlying rationale of giving deference to the findings of the trial court rests with the

knowledge that the trial judge is best able to view the witnesses and observe their

demeanor, gestures and voice inflections, and use these observations in weighing the

credibility of the proffered testimony."  Moreover, deferring to the trial court on matters of

credibility is "crucial in a child custody case, where there may be much evident in the

---

[2] Although appellant's assignment of error mentions the sufficiency of the evidence, the substance of her argument focuses upon the manifest-weight-of-the-evidence standard.  We limit our review accordingly.

parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-3146, ¶ 7 (4th Dist.).

**{¶39}** The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest-weight-of-the-evidence standard is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986).

**{¶40}** In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.").

**{¶41}** Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's judgment is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, ¶ 62 (4th Dist.); *In re R.L.*, 2012-

Ohio-6049, ¶ 17 (2d Dist.), quoting *In re A.U.*, 2008-Ohio-187, ¶ 9  (2d Dist.) ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements . . . have been established.'").  A reviewing court should find a trial court's permanent custody judgment against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"  *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175; *see Black's Law Dictionary* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential standard of review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence").

## PERMANENT CUSTODY PROCEDURE

**{¶42}** Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing.  The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency.  R.C. 2151.414(A)(1).  Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'"  *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C. 2151.01(A).

R.C. 2151.414(B)(1)

{¶43} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and, as relevant here, the following circumstance applies:

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶44} In the case before us, appellant agrees that the children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. Moreover, clear and convincing evidence demonstrates that the children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. With this finding satisfied, the next consideration is whether granting the agency permanent custody of the children is in their best interests.

BEST INTEREST

{¶45} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's GAL, with due regard for the child's maturity; (3) the child's custodial history; (4)

the child's need for a legally secure permanent placement and whether that type of

placement can be achieved without a grant of permanent custody to the agency; and (5)

whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶46} Deciding whether a grant of permanent custody to a children services

agency will promote a child's best interest involves a delicate balancing of "all relevant

[best interest] factors," as well as the "five enumerated statutory factors." *C.F.*, 2007-

Ohio-1104, at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56.  However, none of the

best interest factors requires a court to give it "greater weight or heightened

significance." *Id.*  Instead, the trial court considers the totality of the circumstances

when making its best interest determination.  *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d

Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.).  In general, "[a] child's best interest

is served by placing the child in a permanent situation that fosters growth, stability, and

security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of*

*Ridenour*, 61 Ohio St.3d 319, 324 (1991).

{¶47} In the case at bar, we believe that the record contains ample, clear and

convincing evidence to support the trial court's decision that placing the children in the

agency's permanent custody is in their best interests.  The record does not support a

finding that the trial court committed a manifest miscarriage of justice.  Therefore, the

trial court's judgment is not against the manifest weight of the evidence.

1.  Children's Interactions and Interrelationships

{¶48} The evidence shows that the children are thriving in their current foster

home, and the foster home provides the children with a safe, stable, and secure

environment in which to develop.  The children are bonded with the foster family, and

the foster parents plan to adopt the children if the agency receives permanent custody of the children.

{¶49} The evidence further establishes that appellant loves her children. However, the evidence also demonstrates that appellant lacks protective capacity to the extent that when the children were infants, they needed to be life-flighted to Nationwide Children's Hospital, where they received intensive care for life-threatening conditions. Moreover, appellant did not consistently visit the children. Notably, appellant last visited on July 3, 2023, even though she had multiple opportunities to attend other visits. Furthermore, appellant's interactions with the children barely progressed throughout the two years that the children were in the agency's temporary custody, and the agency remains highly concerned for the children's safety if the court were to place them in appellant's care. Appellant may love her children, but her actions have not shown that she can engage in positive interactions or share healthy relationships with the children.

## 2. Children's Wishes

{¶50} The children are too young to express their wishes, but the GAL recommended that the court place them in the agency's permanent custody. *C.F.*, 2007-Ohio-1104, at ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 2014-Ohio-2961, ¶ 32 (4th Dist.) (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as child directly expresses or through the GAL).

### 3.  Custodial History

**{¶51}** The children have been in the agency's temporary custody since shortly after birth and have remained in its continuous temporary custody for well over 12 months of a consecutive 22-month period.

### 4.  Legally Secure Permanent Placement

**{¶52}** "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met."  *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95  (11th Dist.) (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts).  Thus, "[a] legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."  *M.B.* at ¶ 56.

**{¶53}** In the case before us, clear and convincing evidence supports the trial court's finding that the children need a legally secure permanent placement and that they can only achieve this type of placement by granting the agency permanent custody.  Throughout the pendency of the case, appellant was unable to display

protective capacities sufficient to give the agency any confidence that the children would be safe if placed in her care.  When they were in her care, appellant did not recognize that the children needed immediate medical attention for body temperatures that were so low that the children felt cold to the touch.  The children's pediatrician described appellant as disconnected and disengaged when he tried to talk with her.  None of the witnesses expressed any confidence that the children would be safe if placed in appellant's care.  Furthermore, even if appellant made slight progress, that progress was not sufficient to give the agency any hope that appellant would be able to protect the children if they were placed in her care.  Consequently, clear and convincing evidence supports the trial court's finding that the children need a legally secure permanent placement and that they cannot achieve that type of placement without granting the agency permanent custody of the children.

{¶54} Based upon all of the foregoing evidence, the trial court could have formed a firm belief that placing the children in the agency's permanent custody is in their best interests.  Thus, its judgment is not against the manifest weight of the evidence.

{¶55} Accordingly, based upon the foregoing reasons, we overrule appellant's sole assignment of error.

CONCLUSION

{¶56} Having overruled appellant's sole assignments of error, we affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge




**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**